IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No.  **02-cv-01531-JLK**

**JOSEPH SALAZAR,**

                    Plaintiff,

v.

**JO ANNE B. BARNHART, Commissioner of Social Security,**

                    Defendant.

---

## MEMORANDUM DECISION ON APPEAL

---

Kane, J.

### I.   Introduction

Joseph Salazar seeks judicial review of the final decision of the Social Security

Commissioner ("Commissioner") denying his claims for Social Security Disability

Insurance Benefits (DIB) under Title II, and Supplemental Security Income

benefits (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 401-433,

1381-1383f.  Jurisdiction exists under 42 U.S.C. § 402 (g).

### II.   Background

Joseph Salazar, now sixty, was born in 1946.  He is a high school graduate, but

spent most of his academic life in special education.  Before his back injury in

1992, Mr. Salazar worked as a union laborer from 1965 through August 1989 and

as a heating and air conditioning installer from November 1990 through June

1992.  R. at 468; R. at 539-44.

Mr. Salazar was injured in an automobile accident at work on June 20, 1992. R. at 134-37.  The emergency room physician diagnosed Mr. Salazar with a contusion to his left shoulder and a cervical sprain.  R. at 135-36.  Mr. Salazar was held in the emergency room for approximately two hours.  R. at 136.  His spinal, left humerus and shoulder x-rays were all negative for fracture-dislocation and did not show any significant abnormalities.  R. at 136-38.  At the time of the accident, Salazar was 46 years old.  *Id*.

Dr. Herrington, Mr. Salazar's treating physician, referred Salazar to physical therapy a month after the accident. R. at 127.  Salazar did not comply with his referral and only completed six of the twelve visits ordered.  *Id*.

A July 1993 bone scan was normal and showed normal activity in the lumbosacral spine.  R. at 147.  On September 1, 1993, Dr. Herrington released Salazar to return to work, noting in his report that he was unable to correlate objective physical findings with Mr. Salazar's subjective complaints of pain despite multiple studies and standard x-rays.  R. at 153-54.   A second orthopedic opinion from Dr. Ralph Kelly found the same disparity.  *Id*.  Referring to that time in his 1995 hearing testimony, Salazar testified he did not return to work because he was "unable to get out of bed" due to pain.  R. at 215.  Dr. Herrington evaluated Salazar's condition again in October 1993, noting standard studies gave no indication of physical problems as result of the car accident.  R. at 153.

On October 15, 1993, Mr. Salazar filed concurrent Title II and Title XVI disability applications alleging disability beginning June 20, 1992.  R. at 35-43.

Salazar sought a declaration of a period of disability, disability benefits and supplemental security income.

In November 1993, Mr. Salazar visited Dr. Nanes of the Pueblo Community Health Center.  R. at 463.  Dr. Nanes performed a physical exam on Mr. Salazar for left hip and knee pain.  *Id*.  Dr. Nanes observed that although Mr. Salazar used a cane, he did not observe any limping.  *Id*.  Mr. Salazar had full range of motion in his left knee without pain, but reported left hip pain with extreme external and internal rotation.  *Id*.  Dr. Nanes found no evidence of any ligamentous strain, noting the "patient's complaints out weight [sic] his [sic] physical findings."  *Id*.

On December 3, 1993, the Social Security Administration sent Salazar separate letters disapproving his claims under both Title II and Title XVI on grounds Salazar was not disabled under agency rules and because his condition was not severe enough to keep him from working.  R. at 81-88.  Salazar filed for reconsideration, and on February 2, 1994, the Social Security Administration reaffirmed both denials.  R. at 108-112.  On February 14, 1994 Mr. Salazar filed a request for a hearing by an Administrative Law Judge ("ALJ").  R. at 113-114.

Mr. Salazar was given a full body bone scan in April 1994 and the physician reported the results were identical to scans taken in July of 1993.  R. at 147.

On February 14, 1995, Mr. Salazar was notified that his hearing with an ALJ was scheduled for the next month.  R. at 159.  A week later Mr. Salazar returned to Dr. Nanes, reporting increased low back pain.  R. at 462.  Dr. Nanes found "nearly

full lumbar flexion," although Mr. Salazar did complain of pain at the extremes. *Id.*  Dr. Nanes prescribed Voltaren and ordered more testing.  *Id.*

In March 1995, the University Hospital Clinic ran EMG and nerve conduction studies on Mr. Salazar both of which came back normal.  R. at 167-72.  A followup neurological evaluation in April 1995 found no evidence of lumbosacral radiculopathy to explain Mr. Salazar's lower back and leg pain.  R. at 160-61.

In June 1995, Mr. Salazar visited Dr. Ravin, of Val d'Isere Health Clinic, for a myofascial pain consultation. R. at 173-77.  Dr. Ravin indicated tenderness to palpation over most of Mr. Salazar's body, but noted that neurological tests indicated no significant abnormalities.  R. at 173-74.  Dr. Ravin indicated on a Med-9 form that Mr. Salazar could participate in "sheltered work only" for twelve months and that working in any capacity "would be difficult."  R. at 177.

In August 1995, Brad Patterson, Ph.D., performed a psychological evaluation at the request of Disability Determination Services (DDS).  R. at 178-83.  Dr. Patterson diagnosed dysthymic disorder with moderately severe depression and anxiety as well as a pain and personality disorder.  R. at 182.  Dr. Patterson noted "significant symptom magnification."  R. at 179.  Dr. Patterson observed that Mr. Salazar tended to portray himself as "dependent and more incapable and emotionally uncomfortable than one might expect."  *Id.*  Dr. Patterson's Clinical Scale Profile suggested Mr. Salazar's behavior created "secondary gain in the form of increased attention and/or freedom from normal behavioral expectations."  R. at 181.  Dr. Patterson also concluded that Mr. Salazar's low intellectual and reading

level were not a "significant impediment" to continuing his past employment. R. at 182.

In a written decision issued November 9, 1995, the Administrative Law Judge ("ALJ") found that Salazar was not disabled and therefor not entitled to a period of disability, disability insurance benefits, or supplemental security income as requested. R. at 21-32.

Between February 1996 and April 1997 Mr. Salazar repeatedly visited Dr. Nanes complaining of low back, left knee, right shoulder pain and fatigue. R. at 451-53, 458-60. On March 16, 1996, Dr. Nanes wrote that he remained "certainly, clinically very unimpressed with [Salazar's] complaints due to the fact that his complaints far outweigh any physical findings." R. at 458. Mr. Salazar's left knee remained "completely unremarkable" and Dr. Nanes reported he saw "nothing at all" indicating Salazar was "the least bit disabled." R. at 458, 453.

Dr. Nanes stated at least twice in multiple medical reports between June and December of 1996 that Salazar "has locked himself into a position of trying to get on permanent disability and this in my opinion seems to be his main goal in life." R. at 458 (June); R. at 453 (December – "[i]t is my impression the patient really wants to be on some sort of government assistance the rest of his life"). In Dr. Nanes's opinion, Salazar was able to work throughout this period of time. *See* R. at 453.

On January 14, 1997 Dr. Ravin re-evaluated Mr. Salazar, confirming his previous diagnosis, including mechanical joint dysfunction in the cervical, thoracic

and lumbosacral spine as well as in the left rib cage, left helm-pelvis.  R. at 188-90.  Dr. Ravin also found limited range of motion in the neck, thoracic and lumbar areas of the spine, spinal tenderness and pelvic muscles weakness.  *Id.*  Again, Dr. Ravin reported tenderness to palpation over most of Mr. Salazar's body, but noted that neurological tests indicated no significant abnormalities.  R. at 189. Based on these findings Dr. Ravin reported Mr. Salazar would not be able stand, sit, walk or use his extremities for any prolonged period of time, and "would only be able to do very light tasks."  R. at 192.

In April 1997, Mr. Salazar again sought treatment from Dr. Nanes and showed him Dr. Ravin's findings.  R. at 451.  Dr. Nanes was openly critical of Dr. Ravin's report.  *Id.*  Dr. Nanes noted for example, that while Dr. Ravin found a limited range of motion in Mr. Salazar's shoulders he found "that patient has full range of motion of both shoulder[s] without any pain."  *Id.*  Dr. Nanes documented his disagreement with Dr. Ravin's report and noted his overall clinical assessments of Mr. Salazar had "not changed one iota."  *Id.*

On April 25, 1997 Mr. Salazar filed a second application for Title II and Title XVI claims to the Social Security Administration.  R. at 325-27, 334-37.  This application was subsequently dismissed at Mr. Salazar's request. R. 536.

On May 9, 1997 the Appeals Council denied Mr. Salazar's request for review and upheld the ALJ's November 1995 decision on his first application for Title II and Title XVI claims.  R. at 11-12.

In July 1997, James H. Evans, Ph.D., performed a psychological evaluation of Mr. Salazar at DDS's request.  R. at 464-67.  Dr. Evans noted Salazar drove himself to the evaluation and was not currently taking any pain medications.  R. at 464-65.  Dr. Evans reported no measurable impairment in concentration or memory and found Mr. Salazar to be independent in his daily activities.  R. at 467.  Dr. Evans also noted no evidence of clinical depression and that Mr. Salazar was capable of functioning socially.  R. at  466-67.  Dr. Evans diagnosed psychosomatic pain disorder and possible malingering.  R. at 467.  Dr. Evans concluded Salazar was trying to look "more impaired than he actually was."  R. at 466.

On August 13, 1997, Salazar requested reconsideration of the Commissioner's denial of benefits. R. at 389.  A week later the Appeals Council vacated its previous decision not to review the ALJ's decision due to additional medical evidence submitted by Mr. Salazar earlier that year.  R. at 6.  The Appeals Council considered the new evidence from Dr. Ravin dated January 14, 1997 and January 21, 1997, but concluded the additional evidence did not provide a basis for changing the ALJ's decision.  *Id.*

Mr. Salazar filed an appeal of the ALJ's 1995 decision to this court in January 1998.  R. at 293-297.  Mr. Salazar revised his appeal to the District Court in May 1998.  R. at 298-300.  On June 22, 1998 the District Court remanded the case to an ALJ for additional administrative proceedings pursuant to sentence four of 42 U.S.C. § 405 (g).  R. at 291, 535.

In October 1998, Salazar sought treatment from Dr. Beata Anasz-Kopecka of Southwest Healthcare System.  R. at 493-96.  Dr. Anasz-Kopecka noted in a Med-9 form that although Mr. Salazar was limited in activity he could perform sedentary work.  R. at 496.  Dr. Anasz-Kopecka also indicated on the form that while Mr. Salazar could not engage in past relevant work, he was not disabled from another occupation.  *Id.*

An MRI in May 1999 revealed a torn rotator cuff, however surgery was not needed.  R. at 492.

In June 1999, Dr. Madsen performed a psychological evaluation on Mr. Salazar at the request of DDS.  R. at 499-505.  Dr. Madsen diagnosed dysthymia and somatization disorder and impaired intellectual functioning.  R. at 501.  Dr. Madsen concluded Salazar had the ability for wide unskilled activity such as simple work related instructions, ordinary work routine and making simple work-related decisions.  R. at 503.  However, he also said Salazar's ability to understand, remember and carry out detailed instructions was severely limited, though not precluded.  *Id.*  Also despite Salazar's severely limited attention span for extended periods and susceptibility for distraction, Dr. Madsen found Mr. Salazar's social interaction and adaptation skills generally to be functioning well.  *Id.*

In July 1999, Dr. Slack performed an orthopedic examination at the request of DDS.  R. at 506-518.  Dr. Slack reported Mr. Salazar's "complaints to be overstated when compared to the examination."  R. at 510.  X-rays revealed a normal left hip, right shoulder, and cervical spine with mild degenerative disc

8

disease in the lumbar spine.  R. at 511-14.  Dr. Slack also reported Mr. Salazar was tender by touch in the lumbosacral area, but that Mr. Salazar would not let him examine his upper right extremities.  R. at 509.  Dr. Slack reported Mr. Salazar's gait was fine and that an assistive device was unnecessary.  R. at 508.  Dr. Slack further noted the popping sound of Mr. Salazar's hip "denote[d] a sound and not instability."  *Id*.

Dr. Slack reported Mr. Salazar could frequently reach, handle, finger and feel with his hands between one third and two thirds of an eight hour day.  R. at 517.  Dr. Slack also noted he thought Mr. Salazar could sit, stand, and walk in an eight hour work day with normal breaks.  R. at 510.

On September 16, 1999, the ALJ held a hearing pursuant to the District Court's instructions for a sentence four remand of 42 U.S.C. § 405 (g).  R. at 289, 291, 535.

In addition to receiving medical evidence documenting Mr. Salazar's medical history, the ALJ took testimony at the hearing from Mr. Salazar and from a vocational expert, Kenneth Olson ("the VE").  R. at 535-574.

III. ALJ's 1999 Decision

In a thirteen-page decision dated December 16, 1999, a different ALJ again found Salazar was not disabled and denied his request for benefits.  R. at 266-78.  In doing so, the ALJ analyzed evidence of record and followed the five sequential steps for evaluating disability outlined in Social Security Regulation 404.1520(a).  20 C.F.R. § 404.1520(a) (2001).

At step one, the ALJ found Mr. Salazar had not engaged in any substantial gainful activity since the date of alleged onset on June 20, 2002.  R. at 267.

At step two, the ALJ found Mr. Salazar's impairments were severe and included dysthymia, decreased intellectual functioning, personality disorder, chronic lumbar strain, degenerative disc disease of the lumbar spine, myofascial pain disorder and an upper right extremity injury.  *Id.*

At step three, the ALJ found Mr. Salazar's impairments were insufficient to establish disability at this step because they did not meet or equal the required level set forth in the Listing of Impairments at 20 C.F.R. Part 404, Appendix 1, Subpart P.  R. at 268.  The ALJ further noted because the record lacked specific diagnostic findings or clinical indications to satisfy the requirements, a finding of disability could not be made based solely on medical considerations.  *Id.*

At step four, the ALJ found Mr. Salazar unable to perform his past relevant work as a construction worker, livestock attendant, automobile mechanic helper and metal fabricator.  R. at 274; R. at 276, Finding 6.  The ALJ, however, found Mr. Salazar retained the Residual Functional Capacity to perform medium work.  R. at 276, Finding 5.  This included lifting 50 pounds occasionally and twenty five pounds frequently, and to sit, stand and walk for six hours if given regular rest breaks.  *Id.*  Mr. Salazar was also limited to no more than occasional climbing, stopping, kneeling, crouching, crawling or reaching overhead.  *Id.*

Mentally, the ALJ found Mr. Salazar to be limited to unskilled work activity involving simple and routine tasks and without frequent interpersonal contacts.  *Id.*

The ALJ concluded Mr. Salazar's capacity for full range of medium work was reduced by his non-exertional limitations.  R. at 277, Finding 7.

The ALJ considered Mr. Salazar's testimony, objective medical findings, daily tasks, medication history and other like factors in determining Mr. Salazar's subjective complaints of pain, and found Mr. Salazar not fully credible to the extent he alleged total disability as a result of pain.  R. at 276, Finding 4.  The ALJ found the medical evidence and record when viewed in its entirety combined with Mr. Salazar's own account of his daily activities did not substantiate his allegations of total disability.  R. at 269.

The ALJ observed that at step five, the burden of proof shifted to the Social Security Administration to show that other jobs existed in significant numbers, that Mr. Salazar could perform consistent with his medically determinable impairments, functional limitations, age, education and work experience.  R. at 275.  The ALJ noted Salazar's age, 53 at the time of the second decision, made him an individual closely approaching an advanced age.  *Id.*; R. at 277, Finding 8. The ALJ also noted that at the time of his alleged disability onset, however, Salazar at 46 was a "younger individual" under applicable guidelines.  *Id.*

The ALJ noted Salazar's history of special education with poor reading and math skills. R. at 275; R. at 277, Finding 9.  The ALJ also found Salazar had no acquired work skills that were transferable to the skilled or semiskilled work functions of other work.  *Id.*; R. at 277, Finding 10.

Based on testimony from the VE, the ALJ found Salazar capable of making an adjustment to work which existed in significant numbers in the national economy to jobs such as hand packer, assembler, kitchen worker, and inventory clerk.[1] R. at 275.  Based on Salazar's exertional capacity for medium work with normal breaks and his age (then 53), educational background, impaired mental functioning and work experience, the ALJ concluded Mr. Salazar was "not disabled" at any time through the relevant time period of the decision.  R. at 276; R. at 277, Finding 11.

In December 1999, Salazar submitted a request for review of the ALJ's decision which was subsequently granted.  R. at 257-58.   In April 2000, Mr. Salazar submitted additional documentation of his medical condition to the Appeals Council as "new evidence."  R. at 245-46.  Included in the record before the Appeals Council was a March 8, 2000 report from Dr. Duran of St. Mary Corwin Regional Medical Center indicating Mr. Salazar had undergone an "L4-L5 lumbar laminectomy with left sided L4-L5 diskectomy" on February 28, 2000.   R. at 249.  Salazar was transferred to an extended care facility where he underwent physical therapy, occupational therapy and general rehabilitation.  *Id.*  Salazar recovered well, and by March 7, 2000, the report stated a group meeting of the rehab team felt Salazar "had not only met his rehab goals and was perfectly appropriate for discharge but also that the patient was malingering some pain symptoms."  *Id.* at 249-50.  In August 2000, Dr. Danylchuk, the orthopedic physician overseeing Mr. Salazar's recovery post-surgery, indicated in three

---

[1] The VE did not have the national statistics for inventory clerk.

sentence letter "to whom it may concern," that he was treating Salazar, that Salazar was "not capable of any type of gainful employment," and that "[t]his status is permanent."  R 244.

The Appeals Council declined to reconsider the ALJ's December 1999 decision in light of these new submissions, making the decision the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  R. at 242.  Salazar then filed the instant appeal.

## IV. Standard of Review

The court reviews the Commissioner's decision to determine whether her factual findings were supported by substantial evidence in light of the entire record and whether she applied the correct legal standards.  *See Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000).  Substantial evidence is that which a reasonable person would accept as adequate to support that determination.  *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).  In determining whether the Commissioner's decision is supported by substantial evidence, the court does not reweigh evidence nor substitute its judgment for that of the Commissioner.  *Qualls*, 206 F.3d at 1371.  However, "[e]vidence is not substantial if is it overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

## V. Merits

The Commissioner has established a five step process for determining whether a claimant is disabled within the meaning of the Social Security Act and is thus

entitled to disability benefits. 20 C.F.R. § § 404.1520, 416.920. *See also Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (describing the five steps in detail). The claimant bears the burden of proof through steps one through four of the analysis. *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). Once the Commissioner has determined at step four that the claimant cannot perform his past relevant work, the claimant has established a prima facie case of disability. *Id.* At step five, the burden shifts to the Commissioner to show the claimant can perform work that exists in the national economy, taking into account his residual function capacity, age, education, and work experience. *Id.*

Here the ALJ reached the fifth step of analysis. R. at 275. Thus the Commissioner bore the burden of proving Mr. Salazar could perform a significant number of jobs in the national economy. *Id.* The ALJ's decision that the Commissioner met this burden must be supported by substantial evidence in the record. *Nielson*, 992 F.2d at 1121.

Claimant maintains the Commissioner's final decision to deny benefits should be reversed because: (1) the Commissioner failed to apply the correct legal standard with respect to the new evidence, specifically Dr. Duran's March 2000 report on Mr. Salazar's back surgery, which had been provided to the Appeals Council after the ALJ issued his December 1999 decision; (2) the ALJ applied incorrect legal standards and his conclusions are not supported by substantial evidence; (3) the ALJ failed properly to evaluate the cross-examination of the VE; and (4) the ALJ failed to consider the fact that Mr. Salazar was approaching age

fifty five on the date he was last insured.  Pl.s' Br. at 5-17.  I address these issues seriatim.

A.  The Appeals Council Applied the Correct Legal Standards for Considering "New Evidence."

The Appeals Council's refusal to consider Salazar's "new evidence" of his back surgery was not erroneous.  Federal regulations direct the Appeals Council to consider "any new evidence presented to it, if it is new, material and *relates to the time period before the ALJ's decision*."  *Tyson v. Apfel*, 107 F. Supp. 2d 1267, 1271 (D.Colo. 2000).  In order for the new evidence to be accepted Salazar would have had to demonstrate the new evidence: (1) would likely result in a different determination at the administrative level; and (2) related to the time period for which benefits were sought and denied.  *Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th Cir. 1991).  Medical records later than the relevant time frame may be considered if they relate back to the time frame in question.  *Baca v. Dep't of Health & Human Servs*., 5 F.3d 476, 479 (10th Cir. 1993).  Properly qualified "new evidence" presented to the Appeals Council, but not the ALJ, becomes "part of the administrative record to be considered when evaluating the Secretary's decision for substantial evidence."  *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).

Materiality cannot be demonstrated by evidence of a subsequent deterioration of a previously non-disabling condition because deterioration, by itself, does not establish that an applicant was disabled at the time of the

administrative hearing.  *Henderson v. Department of Health and Human Services*, 16 F.3d 416 (10th Cir. 1994).[2]

As previously indicated, the new evidence Salazar sought to enter into the administrative record included medical documents relating to operative procedures performed in February 2000.  R. at 248; Pl.'s Br. at 6.  These medical documents show that Salazar exacerbated his back condition on February 20, 2000, while getting up from his couch, two months after the ALJ's decision.  R. at 242, 252.  Salazar's "shooting pain" was so severe that he was unable to walk.  R. at 252.  Dr. Duran, part of the orthopedic team treating Salazar at the time and post-operatively, reported an MRI found a herniated disk along with degenerative disk disease two days after Salazar's exacerbation. R. at 249-50.  Dr. Duran was also the physician who wrote of Salazar's post-operative malingering symptoms.  *Id.*

In explaining its reasons for declining to consider Salazar's new evidence, the Appeals Council explained Mr. Salazar severely exacerbated his condition in February 2000, and this was after the end of the period in question.   R. at 242.  The Appeals Council further explained the "new evidence" did not relate to the period before the judge as the actual exacerbation occurred two months after the ALJ's decision.  *Id.*  The Appeals Council discussed Dr. Duran's discharge report, noting the statements regarding the malingering of pain symptoms and found this observation to be consistent with previous notations in the record.  *Id.*

---

[2] Unpublished opinion.  See Godsey v. Bowen, 832 F.2d 443, 445 (7th Cir. 1987); see also Sanchez v. Secretary of Health & Human Servs., 812 F.2d 509, 512 (9th Cir. 1987).

The Appeals Council's determination that Salazar's new evidence did not relate to the disability period at issue and would not otherwise undermine the substantial evidentiary basis for the ALJ's decision was not erroneous. *See O'Dell*, 44 F.3d at 858; *see also Hargis*, 945 F.2d at 1493 (stating new evidence must relate back to the time period before the ALJ's decision). While the record indicates Salazar was diagnosed with degenerative disc disease in addition to the herniated disc, and that this might relate back to the operative time period, the record does not support a finding that any resulting disability existed before the ALJ's decision. *See* R. at 147; R. at 153-54; R. at 160-61; R. at 451-63; R. at 506-518. For example, Dr. Duran detected an obviously herniated disk from an MRI administered right after Salazar's February 20, 2000 exacerbation incident, R. at 249, while none of Salazar's previous MRIs revealed any disk abnormality. *See* R. at 125; R. at 147. This is significant considering Mr. Salazar's impairments were treated and evaluated by at least four orthopedic practitioners, none of whom reported a herniated disk or found any indication of a severe exacerbation or anything "remarkable" in their diagnostic tests. *See* R. at 147; R. at 153-54; R. at 160-61; R. at 451-63; R. at 506-518. Not even Dr. Ravin found any evidence of herniations or exacerbations during his examinations. *See* R. at 173-77; R. at 448-450. Likewise, Dr. Nanes, who treated Mr. Salazar ten times and more frequently than any other physician during the relevant time period, never reported any remarkable or otherwise notable degenerative or other problems in Salazar's spine. R. at 453.

Significantly, in reference to the pain resulting from the exacerbation, the intake report from St. Mary Corwin after the exacerbation stated that while Salazar reported he had suffered from back pain for some time, he had "never had a previous occurrence where he was in so much pain that he was unable to walk." R. at 252.  This comment provides further support for the conclusion that this severe exacerbation did not exist before the ALJ's decision.

The only post-operative evidence of disability comes with the three line opinion of Dr. Danylchuk that "[t]o whom it may concern . . . . [Mr. Salazar] is not capable of any type of gainful employment."  R. at 244.  Given the lack of any evidence from Dr. Danylchuk or others suggesting this incapacity existed before the post-period exacerbation and back surgery, I cannot conclude the Appeals Court erred in declining to consider the new evidence.

B.  <u>The ALJ Applied the Correct Legal Standards and his</u>

<u>Conclusions are Supported by Substantial Evidence</u>.

*i. The ALJ Properly Analyzed Claimant's Complaints of Subjective Pain.*

The framework for the proper analysis of the evidence of allegedly disabling pain requires courts to consider: (1) whether Claimant established a pain producing impairment by objective medical evidence; (2) if so, whether there is a "loose nexus" between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling.  *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987).

Because credibility is the province of the ALJ, additional factors to be considered in determining the credibility of subjective claims of pain include: persistent attempts to find relief for pain, willingness to try any treatment prescribed, regular use of crutches or a cane, regular contact with a doctor, and combination of psychological disorders. *Huston v. Bowen*, 838 F.2d 1125 (10th Cir. 1988). Other factors to be taken into consideration also include: claimant's daily activities, and dosage, effectiveness and side effects of medications. 20 C.F.R. 404.1529; *Luna*, 834 F.2d at 165-66.

Salazar contends the ALJ failed to apply the correct legal standard in analyzing his subjective pain by not applying any of the three prongs from *Luna*. Pl.'s Br. at 8-11. Though the ALJ did not mention the *Luna* test by name, the record shows the ALJ properly applied its relevant prongs. The ALJ met prong one by determining objective medical evidence established Salazar had pain producing impairments such as chronic lumbar strain, degenerative disc disease of the lumbar spine and a myofascial pain disorder. R. at 267; R. at 276, Finding 3.

The ALJ met prong two by undertaking a detailed analysis of Mr. Salazar's subjective complaints of pain in relation to his medical and psychological history. R. at 268-73. Though not stated in Luna's terms of "loose nexus" it is clear from looking at the ALJ's report that he was analyzing both the objective and subjective evidence to see if a "loose nexus existed. *See Luna*, 834 F.2d at 163 (stating once an ALJ determines that "objective medical evidence showed that [claimant] had a back problem producing pain, the ALJ is required to consider [claimant's]

assertions of severe pain and to decide whether he believed them."  The ALJ also examined Mr. Salazar's various daily activities, use of mild over-the-counter pain medication such as Tylenol, prescription medications for only mild to moderate pain killers, and use of a cane that was not medically necessary in determining Mr. Salazar's claims of disabling pain.  R. at 268-69; R. at 271-73.

The ALJ met prong three by weighing Salazar's subjective complaints with the above objective evidence and additional factors and explaining why the specific evidence relevant to each factor led him to conclude that Mr. Salazar's complaints were not credible.  *See* R. at 269.  A lack of medical evidence supported Mr. Salazar's disabling pain allegations and his testimony alone cannot establish non-exertional impairment.  *See Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990) (per curiam) (subjective complaints alone insufficient to establish disabling pain). Substantial evidence supports the ALJ's determination that Claimant's allegations of disabling pain are not credible to the extent alleged.   Thus the ALJ properly applied *Luna* in finding the Claimant's complaints were not fully credible.

*ii. The ALJ Properly Evaluated Mr. Salazar's Depression.*

An ALJ should not reject the opinions of medical providers, "without adequate justification" and should not substitute his own medical judgment for that of mental health professionals.  *Winfrey v. Chater*, 92 F.3d 1017 (10th Cir. 1995).

Claimant maintains the ALJ improperly evaluated Mr. Salazar's impairment resulting from depression by dismissing Dr. Madsen's psychological evaluation. Pl.'s Br. at 14-16.   Specifically, claimant maintains the ALJ disregarded without

reason Dr. Madsen's findings that Mr. Salazar was mentally impaired in all nineteen categories of his "Work Capacity Evaluation (Mental)." *Id.*

Claimant's argument that the ALJ improperly dismissed Dr. Madsen's psychological evaluation is unfounded as there is nothing in the record to indicate any dismissal of Dr. Madsen's findings by the ALJ. See R. at 264-278. In contrast, the ALJ presents a thorough and detailed analysis of Dr. Madsen's findings, even using the information to determine claimant's range of unskilled work activity. R. at 271.

Further, claimant's argument that Dr. Madsen indicated Mr. Salazar suffered from psychological problems in all nineteen categories is deceiving. Out of all nineteen categories, Dr. Madsen only found Mr. Salazar to have problems that were marked in four categories. R. at 503-505. Claimant's allegations fail to interpret Dr. Madsen's report as a whole and construe its cited findings out of context. *See id.* For example, Dr. Madsen reported Mr. Salazar's overall social interactions and ability to adapt were only slightly impaired. Such findings are a far cry from claimant's sweeping allegations. See Pl.'s Br. at 14-16. The ALJ did not dismiss Dr. Madsen's conclusions for his own opinions. *See* R. at 271. Rather, the ALJ correctly interpreted Dr. Madsen's findings in light of the entire report and their overall conclusions. *Id.*

### iii. The ALJ Properly Assessed Mr. Salazar's Combined Impairments.

Next Salazar argues the ALJ failed correctly to consider the net effect of his combined impairments. Pl.'s Br. at 12-13. Claimant maintains the ALJ never

considered the combined effect of the Mr. Salazar's lumbar problems, chronic pain, psychological and intellectual limitations as required by *Luna*. Pl.'s Br. at 12-13.[3]

It has already been established that the ALJ properly followed *Luna*. Specifically, the ALJ evaluated the net effect of Mr. Salazar's medical and psychological reports as well as educational history in determining his RFC. R. at 267-74. The ALJ also considered the combined effect of Mr. Salazar's impairments in posing the hypothetical to the VE. R. at 275. Salazar's argument is unpersuasive.

*iv. The ALJ Properly Assessed the Claimant's Credibility.*

Credibility determinations are particularly the "province of the finder of fact and [the court] will not upset such determinations when supported by substantial evidence. *Kepler v. Chater*, 68 F.3d 387, 391. (10th Cir. 1995). Nonetheless credibility determination finding must be "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir. 2002).

Claimant argues the ALJ finding against his credibility was not supported by substantial evidence. Pl.'s Br. at 14-16. Claimant offers the decline in Mr. Salazar's conditions between Dr. Patterson's examination and Dr. Madsen's evaluations as one example. *Id.*

---

[3] Claimant also argues the court dismissed Dr. Madsen's checking of all nineteen categories as evidence that Mr. Salazar's impairments were more severe. Pl's Brief at 12-13. However, claimant's contentions based on this argument are unpersuasive for the reasons set forth in the previous section.

In this case, the ALJ tied Mr. Salazar's credibility determination to a summary

of his complete medical and psychological record as well as his stated daily

activities.  R. at 268-69.  That record as summarized by the ALJ, contains ample

evidence supporting the ALJ's credibility determination.  *See Qualls,* 206 F.3d

at1372. (stating "so long as the ALJ sets forth the specific evidence he relies on in

evaluating the claimant's credibility" the charge is satisfied).  For example, the

ALJ evaluated the opinions of Drs. Herrington, Nanes, Patterson, Evans, and Slack

that Mr. Salazar magnified his symptoms (R. at 179-81), that his symptoms

outweighed the physical findings (R. at 153, 451, 453, 458, 463), and that he made

himself appear more impaired then he was (R. at 466).  The ALJ noted the lack of

objective clinical evidence, infrequent medical treatment, and use of mild over-the-

counter pain medications and the physicians' repeated reports of malingering.

Given Mr. Salazar's malingering history, the isolated nature of contrary findings,[4]

and the complete medical and psychological record, the ALJ's assessment of Mr.

Salazar's credibility is supported by substantial evidence.[5]

*v. The ALJ Properly Evaluated The Cross Examination of the VE.*

In concluding at step five that Mr. Salazar was not disabled within the meaning

of the Social Security Act, the ALJ relied on the VE's testimony to find that Mr.

[4] Dr. Ravin, a consulting physician who only examined Mr. Salazar twice before the hearing, provided the only evidence in the record providing support for Mr. Salazar's claims.  The court has long recognized that "findings of a non-treating physician based upon limited contact and examination are of suspect reliability. 288 F.3d 1248, 1253 (citing *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987)).  Accordingly, when the record is viewed in its entirety, it is not persuasive that Dr. Ravin's assessments constitute substantial evidence.  Furthermore, Dr. Ravin's own neurological tests failed to show abnormalities, indicating his conclusions were based on mere palpitation that his own lab tests could not quantify.
[5] Mr. Salazar's examples are also unpersuasive as they again rely on his misinterpretation of Dr. Madsen's report and his "nineteen categories."

Salazar was capable of adjusting to work existing in significant numbers in the national economy.  R. at 275; 562-64.  Specifically, the VE testified Mr. Salazar could perform work including hand packer, assembler, and kitchen worker.[6]  *Id.*

Mr. Salazar asserts the ALJ ignored testimony elicited at cross examination by the VE because the VE essentially conceded on cross-examination that a person in Mr. Salazar's position was unemployable.  Br. at 16.  On close inspection, the VE's testimony does not support the contention.  *See* R. at 562-74.  The VE acknowledged Salazar's impairments would be construed as negative factors for securing employment, but stated these same negative factors were already factored into his analysis for possible jobs Mr. Salazar could perform.  R. at 565, 569-70.  The only specific factors brought up on cross examination not taken into account by the hypothetical were Mr. Salazar's concentration problems for extended periods. R. at 569.[7]  Dr.  Madsen's report, however, indicated despite these concentration problems Mr. Salazar's social interaction and adaptation skills generally functioned well.  R. at 504.  Thus, the ALJ properly evaluated the cross examination of the VE in light of the substantial evidence in the record.

*vi. The ALJ Properly Considered Mr. Salazar's Age With Regard To The Date He Was Last Insured.*

---

[6] The VE also suggested "messenger," but noted it may be eliminated because of the Mr. Salazar's inability to travel in unfamiliar places or use public transportation.  R. at 275.

[7] The impairments' degree of severity was also something the VE indicated would be difficult to judge as they would widely vary. R. at 569.  For example the VE stated a person's employability would vary depending on whether they missed a few days of work or weeks.  *See id.*

A claimant who is fifty-five when insured is entitled to Social Security Disability benefits if he can no longer perform his last meaningful employment. 20 C.F.R. 404.1563(d).  Courts generally recognize that the agency "faces a more stringent burden when denying disability benefits to older claimants."  *Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Claimants closely approaching advanced age (ages 50-54), will have their age considered, "along with [any] severe impairment[s] and limited work experience[s] that may seriously affect [their] ability to adjust to work."  20 C.F.R. § § 404.1563(d), 416.963(d).

Mr. Salazar asserts the ALJ failed to consider that he was approaching age fifty-five on the date he was last insured and that if properly considered, a different result would obtain.  Pl.'s Br. at 17 -18.  An examination of the record, however, shows the ALJ explicitly recognized Salazar's age (53) at the time of the hearing as being that of an individual "closely approaching advanced age" but recognizing that on the date of alleged disability onset, Salazar was 46 and classified as a "younger individual."  R at 275, R. at 277, Finding 8.  The ALJ's distinguishing of the two age classifications and his subsequent instructions to the VE demonstrate the ALJ's proper consideration of Mr. Salazar's advancing age.  *Id*.

## VI. Conclusion.

The Commissioner met the burden showing Mr. Salazar retained the RFC to perform jobs existing in significant numbers in the national economy.

Mr. Salazar was not disabled for the time period in question. Although he may be disabled now as a result of his herniated disk, back surgery and the progression

of any other degenerative disk disease, the Commissioner is only called to assess his disability between the time of alleged accident and his second ALJ hearing. The record is complete in showing any disability Mr. Salazar incurred as a result of his disk injury was after this time period.  Additionally, reports of Mr. Salazar's malingering are consistent throughout all the medical and psychological reports with the exception of Dr. Ravin's diagnosis.

In sum, while Salazar's arguments go to the relative weight of the evidence considered (and not considered) by the ALJ, they do not rise to the level of insubstantiality to support the conclusions reached.  Salazar argues the strength of the evidence in his favor and attempts to discredit the evidence on which the ALJ relied.  Properly applied, the operative standard of review precludes reversal under these circumstances.  I may neither re-weigh the evidence nor substitute my judgment for that of the ALJ or the Appeals Council.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir, 1991).  As long as substantial evidence supports the ALJ's opinion, it must stand.  There is substantial evidence to support the ALJ's determination throughout the course of Salazar's two administrative hearings and two appeals.

The ALJ's decision is AFFIRMED.

Dated this 29th day of March, 2006.

BY THE COURT:

S/**John L. Kane** _____
John L. Kane, Senior Judge
United States District Court